National Labor Relations Board v. NSTAR Electric & Gas Corporation Good morning. My name is Keith McCown. I represent NSTAR Electric. I have to throw credit to my partner, Jeff Siegel, without whom I probably could not be here. He is with me as well. The challenge of oral argument, I don't need to tell you, is to take 12 or 15 minutes to actually value-add it to 100 pages of briefing in this case, 7 days of record, 1,000 pages of transcript. This case is particularly challenging because of the issues and the nature of the jobs that are involved here. But this case involves the court's review of the National Labor Relations Board determination as to whether to high-level management side, I don't determine the case, but they are two high-level salary management side jobs that have long existed that way within NSTAR. There's only a handful of them, and the question is whether they have a right to cross the fence and join the big bargaining unit that already exists at NSTAR and has existed for decades. Now, this isn't a typical, therefore, union organizing dispute. It's not like a plant that's never had a union and there's a bunch of people that are going to all vote. This is a small group of employees who have always been on the management team, and they want to cross over. There are two jobs, there's really four issues in the case, and it's important to keep that in mind. In the short time we have, it's almost impossible to cover them all, actually. There are two jobs, transmission system supervisor and transmission, I'm sorry, senior transmission outage coordinator, two jobs. And then there's two issues with respect to each one, whether they have supervisory power, authority, or whether they are managerial employees. Supervisor is a statutory creature, there's a series of addition right in the act. Managerial is a little murkier, it's a case-made creation by both board law and Supreme Court law. So briefly, which is almost impossible to do, what do these jobs do? They work in the control room or adjacent to the control room of an electric utility. The transmission system supervisors engage in real-time activities, day-to-day, hour-to-hour, engaged in issuing orders out into the system, start orders, stop orders, orders to move people here, move people there, start work, stop work. And they are, they have real-time responsibility for the reliability of the system. So they're engaged in both planned work and unplanned work. They deal with long planned work and emergencies that happen now. The outage coordinators are all trained and have all actually served as transmission system supervisors, so they sort of came up through that. They engage in longer-term planning and prioritizing of big projects out in the transmission system. And, I might add, they frequently substitute, not necessarily for a full day, but they frequently perform, very frequently perform the duties of the transmission system supervisor in that sort of real-time assignment and direction. So how can we be value-added in a few minutes? Well, I thought about this, and it struck me that there's four questions that might work through oral argument in a few minutes. And they are, why should you care? These are technical jobs buried deep within NSTAR. Why should the First Circuit Court of Appeals care about that? The second is, why shouldn't you just defer? There's an expert board here that's looked at this. Why shouldn't you just defer to that? The third is, what is it really about these jobs that makes them supervisor or managerial? And the fourth is, well, what's wrong with the way the board looked at it? So if I can spend a few minutes on each of those, I think I'm value-added. Maybe I flattered myself. Why should you care? Yes? From our perspective, there's substantial evidence the court defined it. Yes. And I would put that in my question number three, actually. Why should you care? Well, the Supreme Court cares. The Supreme Court has dealt with the board's treatment of supervisory status twice recently, reasonably recently, in 94 and 01, and actually sharply rebuked the board about the manner in which it had been shrinking the statutory definition of supervisor. So the circuit courts, I would think, should care that the Supreme Court has looked at this and has been critical. The second reason is, seven out of eight circuit courts, your sister circuits, have already dealt with this kind of job in the electric industry. It's not a perfectly standardized job, but it's a common job across the United States in electric utilities. Seven out of eight have reversed the board and found that the board claiming these jobs are non-supervisory was incorrect, and in fact, they were supervisory. They had the attributes of supervisors under the Act. I'm sorry, are these the very same jobs? Well, they're not identical from utility to utility, but they're identical enough. And the board always makes the point, and it's a valid point, that their rulings have to be fact-specific. But there are electric utility dispatchers within every electric utility. And so the jobs are reasonably similar. And the board itself in 1999 said that these jobs are reasonably similar from utility to utility, so that the board could make a, what we say was a categorical judgment as of 1999, that it was going to start finding them non-supervisory. So they aren't perfectly similar. Sometimes they have different names. But the nature of the electrical grid is such that there's a high degree of similarity about what these jobs do from utility to utility. The last reason why you might care is that this case touches on what we contend is a new trend by the NLRB, again, impermissibly, to contrive to shrink the definition of supervisor, or for that matter, expand the definition of employee. And that's with this Oakwood health care ruling, which was issued in 2006. It's not exactly the same as what the Supreme Court has criticized twice, but it's a very similar approach. It's a contrivance that we think is largely based on semantics, and not really on a proper interpretation of these. Do you mean to say, then, that this is a, in your view, the board faithfully applied Oakwood here? In other words, in order for us to reverse, we'd have to say Oakwood got it wrong in the way it construed those statutory terms? No. Okay. Could you, then, just for my benefit, what is the actual argument you want to make about why these, why the board got it wrong in this case on these facts? On these facts? Yeah. You mean with Oakwood, or? No, no. The case before us, which I do care about, the board reversed. I mean, the board concluded something, right? You're saying we should not defer because there was not a majority vote, so why? Yes, that is, okay. I think the easiest way to explain that is to set up the framework. The statute contains, with respect to, again, supervisory status, there's also managerial, which is much murkier. With supervisory status, the statute creates 12 categories, 12 indicia of supervisory status, and those are to be treated in the disjunctive. So if you have any one of them, you're a supervisor. In this case, we contend that these jobs assign, they responsibly direct, and they effectively recommend hiring. Those are three of the statutory criteria. Those, if any one of those is correct, then they're supervisors. Even within those criteria, there are further disjunctive tests. So if you assign, and this is from Oakwood, if you assign, you only need to assign to a place or a time or to an overall course of duties. So if you merely assign, and by the way, you don't have to actually assign, and this is all from Supreme Court case law, you have to have the authority to do it. So the quantity of your exercise is not the issue. It's whether you possess the authority. So if the record shows, which we contend it does in volumes, that transmission system supervisors, and let's say the outage coordinators when they're substituting, assign employees to a time. Start work now. We contend case over. They're supervisors. You have to show independent judgment in the assignment. Yes. Independent judgment is another characteristic. What do you say about the board's conclusion that they were not exercising independent judgment? What does the record suggest they're wrong on that? Well, an easy example. The record contains evidence that the transmission system supervisors on a day-to-day basis tell the field crews when to begin work. So the job is originally set up to start at 4 a.m. The transmission system supervisor begins assessing details at 4 a.m. You know what? We can't start that now because there's another job across town that we need to get done first or we can't shut down that equipment yet. There's, this will immediately escape my expertise, but there are a number of highly trained, highly skilled factors that go into that start work, stop work decision. The transmission system supervisor tells the field crew, hold on. We're not starting at 4. And I think the record shows they started that job at 5.52, almost two hours later. And that is on the direct command of the transmission system supervisor from the control room. That's not relying on the white hard hat line supervisor who is also out there perhaps with the crew, but it's a centralized supervisory authority. And that's just one example. There are lots of examples like that in the record. It might be this job as opposed to time you can assign place. Starting time is an assignment of time? I'm sorry? Starting time is an assignment of time within the meaning of the statute? Yes. Is there a story that makes that clear? I couldn't cite you a case. I think that, I think we've briefed that and I think it's reasonably concrete. I think the way the board of directors... I thought it was things like overtime, et cetera, was more what they had in mind as opposed to... That's another aspect and if... Well, that's a clear aspect, but is there anything that indicates the start time itself? Yes, the record contains evidence. But I know there's evidence about when there's a start time, but I'm saying in terms of the authority about what assign means under the statute, that start time... If a job, there's two ways that these jobs might make decisions about overtime. One is in advance. So based on all the factors that they're assessing, we've got to finish that project by Friday. And looking at the assets we've got to get it done, we're going to have to work overtime on Tuesday, Wednesday, and Thursday to get it done by Friday so we can start the next project. So that's one. Another is the actual decision on Thursday. Jeez, it ran long. There was a lightning storm. Something slowed us down. You're staying on overtime to finish it tonight. Both of those are overtime examples. I thought you were suggesting start time itself was an assignment. I think it is. But I'm asking, besides the thought about whether it is, is there authority in board precedent or any cases suggesting that the designation of a start time, because your examples about the independent judgment went to the independent judgment exercising the start time. So I get that argument. I understand how independent judgment is setting overtime, whether on the day in which the overtime is assigned or in advance. If it says an assignment, the precedent seems clear that that would be if the record supported that. But you were suggesting the record supports start time. Does the record show that independent judgment is exercised in assigning overtime? Yes. That's exactly what I was just talking about. These control room jobs would be assessing the need to continue working past the end of the shift to get something done in order to get to the next task. And if the record makes that clear? I believe the record makes that abundantly clear in its 1,000 pages, yes. Yes. And when you add, as I was starting to say before, you've got these disjunctive tests so that all we have to show, the burden is on us to show supervisor status or manager. We accept that burden. Then there's a question of, well, how big is that burden really? I'm sorry. I hate to do this to you, but just before we leave the overtime point, I thought that the board found that the field supervisors had the ultimate authority on overtime. I think the record is not as clear on that as the board would like you to believe. I believe the record fully supports that the transmission system supervisors have that call. They may obviously work in conjunction with field supervisors, but they have the authority to make the call. They don't always make it. They may make it as a team. And the field supervisor may push back and say, holy cow, I've got to do something else today. But all the transmission system supervisor needs is the possession of the authority. And they have, I think the record is clear that they have that authority. So what's the source of it? It's their, well, that's an interesting question. It's their job function. It's their, it's not mere paper authority, as the board likes to call it. They have a defined job function within NSTAR. They have a series of documents that further explain what they do and what they can do or can't do, or what they're supposed to do with respect to projects. You've used your time. That was an immediate stop. Thank you. I would direct your attention to Maine Yankee, where the First Circuit, in a very similar case, said, please, do not transmute preconception into judgment. We think that's what plagues this case. Thank you. May it please the Court. My name is Jeff Barrett. I'm here today on behalf of the National Labor Relations Board. Your Honors, as the Board has acknowledged in our brief, the two positions that are at issue here, which, with the Court's indulgence, I'll use the acronyms of TSS, the Transmission System Supervisors, and the STOCs, the Senior Transmission Coordinators, they are highly skilled and trained employees who perform an integral role to NSTAR's ability to, as the record kept referring to, keeping the lights on in eastern Massachusetts. The Board doesn't deny that. But what the Board found was that this mere fact that they do play this very important role doesn't mean that they meet any of the very specific statutory indicia of supervisory authority that are set forth in 211 of the Act, nor that they exercise independent authority in doing so. Likewise, regardless of how important they are to NSTAR, it also does not transform them into managerial employees. This is sometimes a hard concept for employers to come across or to accept the fact that you can have people who are very important in your operation and yet they don't meet these definitions. I would imagine that if you asked any of the linemen or the other field employees who are out in the storms, you know, keeping the lights on, that they would think that they're pretty important to what goes on as well. And they make a lot of decisions in the day-to-day operation of their job as they're throwing switches and manually operating, you know, working in coordination with these positions back at the NSTAR's NERV Center, that they're making decisions in what they're doing as well. But there's no assertion, certainly, that they are supervisors or managerial employees either. You know, if we look at the companies briefed closely, there is a notable absence, almost entirely, on their discussion of how these individuals function out in the field. And that is any reference to the field supervisors. I was glad Your Honor had brought up the field supervisors this morning, because they do play a role as well. When we talk about assignment, about when these individuals, the field employees, I'll refer to broadly as we do in our briefs, the field employees, but there are a number of categories of employees that that encompasses. When they are to report, what shifts they're supposed to work, what projects they're supposed to work on. These, this type of assignment is not performed by the TSS's and the STOC's. This is the field supervisors who are having these conversations. I would like to jump right to the issue of overtime. I believe that the record is clear and does provide substantial evidence supporting the board's position. Now I stress that, of course, because were this court to review the facts de novo, it might be inclined to make a different decision. And if it was, that's not why we're here. We're looking for substantial evidence supporting the board's position. That's certainly not saying that there are not, there's not the possibility of finding some fact in the record that supports that company's position. But we maintain the substantial evidence does support the board's decision. On the issue of overtime, unfortunately I don't have the recall of the transcript pages, but it is in our brief where we discuss the bulk power operator, bulk power manager, John Conlon, testified about the overtime authority of the TSS's and his testimony is anything but clear. It's quite vague. After five days of testimony, and I believe some 700 to 800 pages of testimony, there is no clear evidence from him or from any witness on behalf of the company supporting the idea that they can simply decide it's Thursday, it's the end of your shift, this is coming from a TSS to a field employee for example, you're going to stay over. And making that independent authority, that independent decision with consulting no one else, that you will stay over and you will work this overtime. In contrast, we have the testimony of one of the STOC's, and I would like to point out, it's in our brief, the Senior Transmission Operating Coordinators. There are no non-senior, so we use the term senior, but at least at the current time, or at the time the director was established there were no non-senior people in this position. Senior Transmission Operating Coordinator Clark gave unrefuted testimony that he does not have that authority, and he had previously worked as a TSS, so his testimony included the job functions of the TSS, that they do not have that authority. What we're being pulled down into of course when we're talking about this level of detail is these factual assertions, this evaluation of the record, this determination of what happened based on a lengthy record. Now it's clear that under the precedent of this court, as well as the Supreme Court, that the Board is entitled to great deference on these decisions, and even greater deference in the supervisory context we would assert, and we believe that's well supported. These are fact intensive determinations, these hearings go on for days. It's a matter that Congress entrusted within an expert agency of the National Labor Relations Board to make these determinations, as an agency that sees these cases over and over. Now that's certainly not calling into question the authority or the competence of this court to similarly address these issues, but in the statutory provisions we have in the Act, that deference is owed to the Board. I would like to briefly address the fact that in the company's reply brief, they have made quite an issue of deference and whether or not it is owed to the Board. We maintain that they cite a few select cases in which at times courts have criticized the Board. But it is clear from the precedent of this court, as well as others, that that great deference is still owed. There are recent court decisions from the First Circuit, many of which we cite in our brief, that shows that this deference survives, even if at times the Board has, as the Board acknowledged in the court, reached too far. Now turning to Oakwood for a moment, Oakwood, if not a sea change in the Board's determinations on supervisory authority, it did constitute quite a benchmark time of the Board's supervisory determinations. There were, there are no cases since then, since Oakwood, applying Oakwood, in which a court has not upheld the Board's authority and the framework that it set forth in Oakwood. We cite the case of Avista Corporation out of the D.C. Circuit as just one example. Now the company in its reply brief spent a considerable amount of time trying to distinguish Avista. Our citation to this was to show that there are cases, that it's just yet another example of a court that has upheld the Oakwood standard. And as an, almost an aside, it was one of these cases. Can I ask you about one aspect of the Board's decision on the assignment? Well I guess it's the Board's decision, but it's the Regional Administrator, as adopted by the Board, I guess is technically what it is. In their discussion of assignment of place, I'm having trouble figuring out, is the Board's position that there is an assignment of place, or that the Board hasn't decided whether there's an assignment of place? Because the way it reads, he says, in his opinion, the overall evidence establishes TSS has occasionally dispatched field workers to reassigned locations. However, such assignments, not in quotes, are not permanent. That suggests to me he's saying, as a statutory matter, that's an assignment. Which would mean the sole question would be, in making that assignment as to place, does he exercise independent judgment? But then later, in that same paragraph, the Regional Administrator says, the evidence fails to establish that these assignments, in quotes, are made with any supervisory discretion. What is the Board's position with respect to whether there is an assignment to place, independent of whether there is independent judgment exercised in making such assignments? Well, Your Honor, any assignments that take place, to the extent they are during the nights and weekends, are largely circumscribed by policies, by the limitations that are set forth in the Collective Bargaining Agreement. Yet, to have ad hoc type of assignments, where things happen from time to time, they don't constitute the overall assignment of what the field employees are doing, much less the significant duties or the place and time. So there are ad hoc examples of when a TSS will communicate a need to the field employees about where they need to go. And in that exact circumstance, let's say there's a prioritization question as to which site is the right site to go to. I guess my two questions are, in making that what you call ad hoc judgment, is that an assignment of place? Well, it's not that it's an ad hoc independent judgment, just to clarify. It's an ad hoc assignment. I understand. When you say it's an ad hoc, is that an assignment of place? That is an example of an assignment. OK. So then, what does the record suggest with respect to their authority in making that assignment as a prioritization between two sites, which one to choose? Are they exercising independent judgment in making that? Do they have the authority to do that on their own? No, they do not. OK. What in the record is going to help me figure that out? Well, there are various circumstances when this could arise. During the day, the record shows that there are field supervisors who are consulted. So the TSSes primarily consult with the field supervisors to determine where needs arise and how to fill those needs or how to address those needs. So with the field supervisors, the communication with the field supervisors, that is entirely consistent with the record showing that they are responsible for assigning. Now at night and weekends, it's a slightly different situation, because although field personnel, there's more of a skeletal crew that is available in the evenings and weekends. During the evenings, seven days a week, the record shows that there are rovers assigned that are set by geographical restrictions, one per area. During the daytime on the weekends, there's two per area. So this is where it really becomes a bit more of an interesting question. During the evenings, when there's one rover available in one geographic area and one in a different geographic area, the TSS will call the person who is in the geographic area where the problem arises. Can one ever be sent to a different area? There's very vague testimony on this. Now, there's a suggestion that they can, but there's no specific examples of when that can occur. It seems, reading between the lines a bit, that if there's a rover in one area and he is under, and this is a quote from the record, strict marching orders from the field supervisor to continue that work or to continue doing whatever he or she is doing, then the recourse would be to call the rover from the other area. If there was a discussion of gray zone or gray area between the two areas, I don't think the record exactly bears out the fact that there's a large overlapping gray area. There's testimony, I believe, from S.J.C. Clark that the computer will determine what area things arise in, the status system that's discussed in the gray zone. So maybe just backing up a second so I understand it, the choice of which place to go to, the board's position is that is an assignment of place. And then the exercise of discretion when they're not under strict marching orders and they don't have to check with the field supervisor because it's a night or weekend would be an exercise of independent judgment. But here the position is the record doesn't show that in fact they exercise such independent judgment. And you say that finding is supported by substantial evidence. Is that the board's argument? Not exactly. There is not. It is not a decision involving independent judgment. Independent judgment is taken away by the geographic restrictions. But I guess I'm asking if the record supported the idea that you could assign across roving districts in the event of an emergency or a particular priority, the decision to do that on a night or weekend would be an exercise of independent judgment or would not be? It would not be. Why not? Because if you're calling someone, and I don't recall whether it's southwest or northeast, I'll just say south and northeast to make it a bit easier. If you call the rover in the south because an unplanned situation arose in the south and that rover is under strict marching orders. But if he's not? But if he's not, that's the person who's assigned to that area. There's one person to call. So you call that person because you've been alerted. You as the TSS. No, no. I'm the guy who's... You've been alerted by the SCADA system that a problem has arisen. You never would want two people on a job? Well, the record shows that the person who initially responds becomes a first responder. What about a second responder? I guess that's what I'm asking. Could you call in the second rover to help? The field employee. The field employee assesses the situation and determines what's going on. And fortunately, I apologize for not having a transcript site, but it is in the record in the joint appendix that if there is additional need, the first responder, the field employee, will make that assessment and the field employee will call for backup. It's not a decision that the TSS is making. So they're largely circumscribed. We wouldn't call it independent judgment. It's making a phone call based on a map. And that is not to take away the import of what the TSSes do at all. As I said, they're highly trained, skilled employees. But in this type of situation, in that decision-making process, it's clear who they are to call. Now, in the daytime scenario on the weekends when there are two rovers, the record also contains a fair amount of evidence that shows that they will call the rovers and the rovers will oftentimes decide amongst themselves who will respond to a call. And if rover A is called by the TSS and rover A says, no, I'm busy, or no, Bob, rover B is closer to that, then the TSS, as the record shows, will defer to that decision and simply call B. So they're making calls. This is where they align much closer with the dispatcher type role of making these calls, alerting folks when situations arrive that the computer system alerts them to. So, I mean, we've spoken quite a bit about assignment. I would like to just go back to the idea that or the fact that the board has waded through 50,000 pages of the record and made the decisions that it will. The proper question, as Judge Thompson pointed out, is does substantial evidence support the board's position? Are there pieces of evidence that would support the company's position? We certainly assert that the substantial evidence is there and the deference is owed to the board's decision. I'm seconds away from being out of time, so I'm happy to address any additional questions. Thank you for your time.